IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

MARIA BORDAS,                          )
                                       )
                Plaintiff,             )
                                       )
        v.                             )    Case No.
                                       )    11-4297-CV-W-REL-SSA
CAROLYN W. COLVIN, Acting              )
Commissioner of Social Security,       )
                                       )
                Defendant.             )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Maria Bordas seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to obtain

evidence from a vocational expert, (2) failing to properly consider opinion evidence, (3) failing

to find that plaintiff is illiterate, and (4) failing to find that plaintiff's mild mental retardation

meets the requirements of listing 12.05C. I find that the substantial evidence in the record as a

whole supports the ALJ's finding that plaintiff's is not disabled. Therefore, plaintiff's motion for

summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On September 21, 2007, plaintiff applied for disability benefits alleging that she had

been disabled since July 26, 2007. Plaintiff's disability stems from an affective mood disorder

and diabetes mellitus. Plaintiff's application was denied on November 2, 2007. On April 24,

2009, a hearing was held before an Administrative Law Judge. On November 20, 2009, the

ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 7,

2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the

ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

>Yes = not disabled.
>No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>No = not disabled.
>Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

>Yes = disabled.
>No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

>No = not disabled.
>Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

>Yes = disabled.
>No = not disabled.

Case 4:11-cv-04297-REL   Document 27   Filed 03/11/13   Page 3 of 43

IV.     **THE RECORD**

The record consists of the testimony of plaintiff; her daughter; and medical expert, Morris Alex, in addition to documentary evidence admitted at the hearing.

A.     **SUMMARY OF TESTIMONY**

During the April 24, 2009, hearing, the following individuals testified: plaintiff, plaintiff's daughter, and Morris Alex, M.D. Plaintiff's attorney asked for and was granted 30 additional days to supplement the record with missing Burrell Behavioral Health medical records from prior to October 22, 2008, and after December 6, 2008, indicating that plaintiff was treated before and after that five-week span; however, only records from those five weeks were present (Tr. at 44).

1.     **Plaintiff's testimony.**

Plaintiff's daughter acted as an interpreter during the hearing[1] (Tr. at 42). Plaintiff last worked on July 26, 2007, cleaning and checking meat (Tr. at 47). Before that job, plaintiff worked for Tyson's, also cleaning and checking meat (Tr. at 47). All of her employment history is in meat processing (Tr. at 57).

Plaintiff was 50 years of age at the time of the hearing (Tr. at 47). She cannot read or write in English (Tr. at 47). She is 5 feet tall and weighs 170 pounds (Tr. at 47).

Plaintiff was asked if she has any physical problems which prevent her from working, and she said she does -- she cannot work because she gets really nervous and fights a lot with people (Tr. at 47-48). She was asked how diabetes affects her, and she said her diabetes goes

---

[1]Although plaintiff's daughter was sworn as an interpreter, she clearly did not interpret word for word, as each answer began with "she". For example, "She gets really nervous. She fights a lot with people." I assume plaintiff's daughter did not do any altering of the testimony except changing it from the first person to the third person, but the ALJ did not caution her to interpret word for word during the hearing and there apparently was no other Spanish-speaking person present.

Case 4:11-cv-04297-REL   Document 27   Filed 03/11/13   Page 4 of 43

up and down (Tr. at 48). After plaintiff's attorney was given permission to lead, he elicited that plaintiff has problems feeling tired; it is hard to be on her feet more than 15 minutes because her heels hurt; and she has numbness and tingling in her left hand, right arm, and both feet (Tr. at 48).

Plaintiff's bipolar disorder makes her feel like crying all the time, she is angry most of the time, she does not want to go outdoors or be around people (Tr. at 49). Sometimes she forgets things, sometimes she does not feel like eating, and other times she overeats (Tr. at 49). She has mood swings, she does not sleep well at night, she sees things, she hears voices (Tr. at 49). The voices tell her to hit people (Tr. at 49-50). Sometimes she has thoughts of suicide (Tr. at 50). She does not like to go out in public because she believes people are looking at her in a bad way (Tr. at 50). She does not visit friends; friends do not visit her (Tr. at 50). She is tired, she feels hostility and irritability (Tr. at 50). These symptoms occur every day (Tr. at 50).

About every two or three days, she does not get out of bed (Tr. at 51). She was asked if there were things that make her bipolar disorder worse, and plaintiff, through her daughter, said, "Every day she's more sick. She's not getting any better." (Tr. at 51). She was asked again if there were situations that make her bipolar disorder worse. She said, "Yes. She doesn't have energy. She can't even get up." (Tr. at 51). Then she was asked whether stress makes her condition worse, and she said, "yes" (Tr. at 51).

Plaintiff's medication causes dry throat, dry nose, and trouble breathing at night (Tr. at 51).

Plaintiff lives with her husband (Tr. at 52). None of her three children have lived with her during the past two years (Tr. at 52, 53). When asked whether plaintiff's husband is supportive of her condition, she said, "Yes, but sometimes his -- the money he makes is not

5

enough." (Tr. at 52). She and her husband are buying their home and have not missed any payments (Tr. at 52). Plaintiff has not worked since July 26, 2007 (Tr. at 52-53).

Plaintiff is seeing someone for treatment of her bipolar disorder, but that provider does not speak Spanish (Tr. at 53). Plaintiff's daughter goes to her appointments to interpret (Tr. at 53). She was asked how often she sees her medical provider, and she said, "lately she's been going every three weeks, two weeks, three months" (Tr. at 53). Sometimes she feels better after those treatment sessions (Tr. at 53). Since she no longer works, she thinks she is doing better (Tr. at 54). She does not think she will ever get to where she can go back to work (Tr. at 54). When asked to describe her main problem in doing any job, she said, "She's always angry, mad." (Tr. at 54). When asked if she would be able to get along with anybody at work, she said, "She thinks no because she's worked a lot of years and she's always had problems." (Tr. at 54). Plaintiff gets along fine with her husband and her daughter; it is only difficult for her to get along with people outside her family circle (Tr. at 54). She was asked why she does not get along with people outside her family: "She said that like the neighbors, she doesn't talk to neighbors because you know they drink so she doesn't drink." (Tr. at 55). She was asked why she could not get along with people at work: "She said at work she was working and they would speed up the line or a supervisor would get on to her [for not being able to keep up]" (Tr. at 55). She felt they treated her unfairly at work (Tr. at 55).

Plaintiff does not take insulin for her diabetes even though her doctor said it would be better if she did, because she is scared of needles (Tr. at 55). Yet she checks her blood sugar every day by pricking her finger (Tr. at 55-56). Normally her blood sugar is 160 to 180 before bed and when she gets up (Tr. at 56).

Plaintiff's toes hurt lately, and her pain is an 8 out of 10 (Tr. at 56). The pain is on both feet and will last a lot of days (Tr. at 56). The pain keeps her off her feet (Tr. at 56). She has

6

told her doctor about this and he says it is due to her circulation (Tr. at 57). Plaintiff's doctor has not prescribed any support hose or socks (Tr. at 57). Plaintiff has lost a little weight in the last year (Tr. at 57).

## 2. Plaintiff's daughter's testimony.

When asked whether she lived with her mother at the time, plaintiff's daughter (whose name was not provided during the hearing) indicated that she had a boy friend but moved back home for a little bit so "probably was living with her at the time" she filled out an administrative form saying she did (Tr. at 58). In the Function Report completed by plaintiff's daughter, she said that plaintiff can perform all household tasks, shopping, and finances without difficulty and that she drives (Tr. at 58). She wrote that plaintiff only has difficulty performing activities of daily living if she is having an episode of bipolar disorder (Tr. at 58). Plaintiff's daughter testified that when plaintiff is depressed, she needs to be reminded to take her medication (Tr. at 59). When she is having such a day, plaintiff's daughter can tell because plaintiff will have mood swings and say things that do not make sense (Tr. at 59). When asked to give an example, she said her mother may ask, "Is your dad ok?" when he is at work (Tr. at 59). That will happen about every three or four months (Tr. at 59). On that day she will mostly sit, but she spends some time in her room (Tr. at 59). Such an episode could last a couple of weeks (Tr. at 59). Whenever plaintiff has such an episode, her doctor is always notified (Tr. at 59). Plaintiff's symptoms have continued to get worse, and she is now worse than she has ever been (Tr. at 60).

Plaintiff's daughter goes to the doctor with plaintiff and is certain that the doctor understands all of plaintiff's symptoms (Tr. at 61). Plaintiff's daughter was asked whether there was any trauma in plaintiff's life that caused her problems, and her daughter said, "Yeah. She's always [taken] care of her older brother and her younger brothers. She has I think eight

brothers, including herself and her mother would always, you know, make her take care of the kids and cook and clean." (Tr. at 62). Plaintiff has never experienced any physical abuse (Tr. at 62).

The only side effects from medication that plaintiff's daughter has observed is that plaintiff's feet get swollen every once in a while, she gets headaches, and her appetite changes sometimes (Tr. at 63-64). Plaintiff cries a lot when she is really upset (Tr. at 64). Plaintiff's daughter does not believe plaintiff was treated poorly at work, "[i]t's just the way that she thinks, the way that her brain works." (Tr. at 64).

When the witness was younger, there were times when they had to take plaintiff to a mental institution and keep her there (Tr. at 65). She does not remember the times or dates but probably around 1993 (Tr. at 65). One time about four or five years ago she was taken to the emergency room (Tr. at 66). On that occasion, her medication had not been putting her to sleep so she had not slept in a couple of days and was not herself (Tr. at 66). She stayed at the emergency room until her medication "kicked in" (Tr. at 66). There have been no other recent hospital visits (Tr. at 66).

When asked if there was anything she wanted to add to her testimony, plaintiff's daughter said, "I just feel that she really needs this because it's not that she can't get along with people. It's just, you know, the way she functions. Like she -- the way she thinks about people. She -- I just hope that she gets this because she really needs it. If she doesn't get it she couldn't [sic] probably hurt somebody at work or get herself in trouble." (Tr. at 60). When asked for an example of how plaintiff talks meanly about people, her daughter said, "She just always thinks that people are out to get her when they're not, you know. She -- I don't know, just the way she thinks about people, about herself." (Tr. at 61).

8

3.      **Medical expert testimony.**

Medical expert Morris Alex, M.D., testified at the request of the Administrative Law Judge. There is no evidence to evaluate plaintiff's diabetes -- there is simply one reference in the record from December 20, 2007, to her diabetes not being well controlled (Tr. at 67). With regard to her hypertension, the record indicates that she does not always take her medication correctly; however, there is no evidence of end organ damage (Tr. at 67). Based on her height and weight, she is only mildly obese (Tr. at 67).

Plaintiff's prime impairment is affective disorder (Tr. at 67). The records from Burrell state that her condition was occasionally better on medication, occasionally worse (Tr. at 67). "The real document," completed by Dr. Burton on March 11, 2009, does not indicate the severity of plaintiff's symptoms, but from Dr. Burton's description in this record and the plaintiff's daughter's testimony, plaintiff meets listing 12.04 because her symptoms would be moderately severe (Tr. at 67-68). Accepting what the psychiatrist said, Dr. Alex would find that plaintiff met the listing as far back as July 26, 2007 (Tr. at 68). When asked whether there was "enough actual objective mental status abnormality demonstrated in the psychiatric, psychological evidence in our record to support the conclusions drawn by Dr. Burton in that Exhibit 5F", Dr. Alex said, "yes" and referred to the "detailed notes" (Tr. at 68). Dr. Alex's opinion is based on Dr. Burton's marking "all of them as markedly limited" and from the description of plaintiff's daughter, "I would tend to agree" (Tr. at 69). Dr. Alex did not recommend any further studies but believed that she would "show some recovery" with medication and should be checked in a year or two (Tr. at 69).

B.      **ADMINISTRATIVE REPORTS**

The record contains the following administrative reports:

Case 4:11-cv-04297-REL   Document 27   Filed 03/11/13   Page 9 of 43

**Earnings Record**

Plaintiff earned the following income from 1988 through 2008:

| Year | Earnings | Employers |
|------|----------|-----------|
| 1988 | $ 2,999.00 | Not listed |
| 1989 | 7,640.76 | Not listed |
| 1990 | 4,381.40 | Not listed |
| 1991 | 5,632.15 | Not listed |
| 1992 | 121.90 | Not listed |
| 1993 | 2,230.87 | Not listed |
| 1994 | 0.00 | Not applicable |
| 1995 | 2,000.12 | Cargill Meat Solutions; Serve Fashion, Inc. |
| 1996 | 17,685.19 | Cargill Meat Solutions |
| 1997 | 19,408.80 | Cargill Meat Solutions |
| 1998 | 19,703.06 | Cargill Meat Solutions |
| 1999 | 8,078.89 | Cargill Meat Solutions |
| 2000 | 21,864.05 | Cargill Meat Solutions |
| 2001 | 11,957.55 | Cargill Meat Solutions |
| 2002 | 21,538.20 | Cargill Meat Solutions; Tyson Poultry, Inc. |
| 2003 | 23,120.63 | Cargill Meat Solutions |
| 2004 | 20,029.24 | Cargill Meat Solutions |
| 2005 | 26,905.80 | Cargill Meat Solutions |
| 2006 | 31,228.51 | Cargill Meat Solutions |
| 2007 | 18,102.59 | Cargill Meat Solutions; Principal Life Insurance Co. |
| 2008 | 944.00 | Cargill Meat Solutions |

Case 4:11-cv-04297-REL   Document 27   Filed 03/11/13   Page 10 of 43

(Tr. at 138-141).

Plaintiff's alleged onset date is July 26, 2007; however, her earnings record reflects that she continued to work after her alleged onset date.

**Disability Report - Field Office**

On October 2, 2007, M. Nussbaum, a Social Security interviewer, had a face-to-face contact with plaintiff and observed that she had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing (Tr. at 146-148).

**Function Report - Adult - Third Party**

On October 8, 2007, plaintiff's daughter, Erica Borda, completed a Function Report - Third Party (Tr. at 149-156). She described plaintiff's typical day as doing "normal wife house work" and taking her medication. Plaintiff has trouble with personal care only if she is having a "bad bipolar episode". Plaintiff "can do everything if she is feeling good." Ms. Borda has not observed any changes in plaintiff's cooking habits since her illness. Plaintiff does "all the cleaning, cooking, etc." She does not go outside very often, but when she does she drives or rides in a car and can go out alone. She shops in stores, but instead of going once a week like she used to she now goes once a month or sends someone else. She is able to pay bills, handle bank accounts, and count change. Plaintiff does Bible study every day and puzzles every weekend. During her bipolar episodes, she does not do these things often and maybe not at all. Although she goes to church once in a while, she does not typically spend time with anyone outside her family.

Plaintiff's impairment affects her ability to understand "unfamiliar situations", remember (she has short memory spans), concentrate (she is "thinking of other stuff"), and get along with others outside her family. It does not affect her ability to lift, sit, climb stairs, squat,

11

kneel, bend, talk, use her hands, follow instructions, stand, hear, reach, see, walk, or complete tasks. When asked how long plaintiff can concentrate, Ms. Borda wrote, "It depends on the concentration level needed for the subject." She is able to finish what she starts sometimes. Plaintiff has never lost a job due to problems getting along with other people. Plaintiff does not handle stress or changes in routine well. "She does not handle stress at all. She will have a big bipolar episode."

### Disability Report - Adult

In an undated, unsigned Disability Report, plaintiff reported that she can "speak and understand English," but she cannot "read and understand English" nor can she write more than her name in English (Tr. at 157-165). She cannot work because of "bipolar" which causes her to be paranoid around people. Her condition does not cause pain or any other symptoms. "Did you work at any time after the date your illnesses, injuries, or conditions first interfered with your ability to work?" Plaintiff responded, "no" -- however, she has earnings from 2008 and her alleged onset date is July 26, 2007. She noted that she was "presently employed but not performing work activity".

As a meat processor, plaintiff did no writing, walking, sitting, climbing, stooping, kneeling, crouching, crawling, or reaching. She spent eight hours per day standing and handling, grabbing or grasping big objects. She lifted less than ten pounds.

### Disability Report - Appeal

Plaintiff's daughter, Erica Borda, completed a Disability Report - Appeal on behalf of plaintiff (Tr. at 175-181). Ms. Borda reported that plaintiff's condition has gotten worse. "She will not get out of the house unless her children beg her to. She is very depressed, emotionally, physically and mentally. It's hard for her to be around people out in public. She doesn't live a

normal life anymore. Since her disability denial, he insecurity and anxiety has increased." Ms. Borda wrote:

> She needs to be reminded of her daily needs. She has trouble making decisions, she also has trouble determining right from wrong. There are instances where she is out of touch with reality. She has a very negative attitude towards life. As stated before, her conditions are worsening. The denial of her disability only made the situation worse. All of her conditions are worsening by the day.

C.    *SUMMARY OF MEDICAL RECORDS*

On January 17, 2007, plaintiff saw Timothy Ryan, D.O., at Missouri Valley Physicians (Tr. at 201-205). He noted that she was pleasant, and her psychiatric exam was normal, showing appropriate judgment and insight. On physical exam she had no edema[2] or varicosities (having varicose veins) of the extremities. Her gait and station were normal, range of motion and strength were normal. Her entire physical exam was normal except she was noted to be obese. "A translator came with the patient." Dr. Ryan assessed insulin-dependent diabetes; however, plaintiff was not using insulin. "The diabetes has worsened. Will not change medication, continue to monitor for complications." Dr. Ryan prescribed Actos Plus Metformin,[3] and he discontinued her Glucophage (for diabetes). He also assessed unspecified hyperlipidemia and noted that plaintiff's elevated cholesterol was "stabilizing" and he did not change her medication. "The patient is not attempting to follow a low saturated fat diet." He reviewed clinical guidelines with her. Finally, he assessed hypertension, unchanged. He did not prescribe any medication, but "patient-modifiable factors were reviewed." He told her to come back in a month and wrote, "PT HAS NOT BEEN TAKING HER MEDS CORRECTLY, HAS TAKEN MORE OF HER BLOOD PRESSURE [MEDICATION] THAN SHE WAS TO TAKE I.E.,

---

[2]Edema is swelling caused by excess fluid trapped in the body's tissues.

[3]Oral medication to control Type 2 diabetes mellitus.

13

DIOVAN, HAD LONG DISCUSSION WITH PT ON HOW TO TAKE HER MEDS AND WHAT THE

MEDS ARE FOR.  ALSO INSTRUCTED HER NOT TO CHANGE HOW SHE TAKE[S] HER MEDS

WITHOUT DISCUSSING WITH ME." (emphasis in the original).

On January 24, 2007, plaintiff saw Mica K. Newman, M.D., at Missouri Valley

Physicians for an annual gynecological exam (Tr. at 205-208).  She reported suffering from

gastroesophageal reflux disease, diabetes, and hypertension.  Dr. Newman performed a full

physical exam and noted, among other things, no edema or varicosities of the extremities;

normal gait, station and posture; full range of motion; normal strength; no tenderness in any

extremity; oriented to person, place, time and general circumstances; mood and affect were

appropriate.  Everything about plaintiff's exam was normal.

On February 8, 2007, plaintiff saw Dr. Ryan for cold symptoms (Tr. at 210-214).  He

observed that she was pleasant and had appropriate judgment and insight.  Dr. Ryan

performed a full physical exam and noted, among other things, no edema, normal gait, normal

station, normal posture, normal range of motion, normal strength.  She was noted to be

overweight, but everything else was listed as normal.  Plaintiff had been accompanied by her

daughter.  Dr. Ryan assess insulin-dependent diabetes and wrote, "The diabetes remains

satisfactory.  Will not change medication, continue to monitor for complications."  He assessed

hypertension, noting that it was stable and no prescriptions were given.  He assessd acute

bronchitis which was stable.  She was prescribed an antibiotic and told to return in a week.

On February 12, 2007, plaintiff saw Dr. Ryan complaining of fever, diarrhea, cough,

and being lightheaded when she stands up (Tr. at 215-219).  Dr. Ryan observed no edema, her

gait was normal, station was normal, posture was normal, she had normal range of motion,

normal stability, normal strength, normal judgment, normal insight.  Her physical and

psychological exams were normal except she was noted to be overweight.  "A family member

14

came with the patient and acted as translator." Dr. Ryan assessed insulin-dependent diabetes mellitus which "remains satisfactory. Will not change medication, continue to monitor for complications." He assessed hypertension "stable", cough "stable", nausea and diarrhea. He prescribed Colestipol HCL (reduces cholesterol). He assessed bipolar affective disorder, mixed, recurrent, but he did not prescribe any medications and his five-page medical record reflects no symptoms reported or observed. Dr. Ryan noted that he would give plaintiff a one-week work excuse. Dr. Ryan wrote a letter indicating that "for medical reasons, it is inadvisable that [plaintiff] return to work until 02/19/2007. Ms. Guevara[4] was last seen for ILLNESS." (Tr. at 214).

On March 6, 2007, plaintiff saw Dr. Ryan for a follow up on her mammogram (Tr. at 226-229). She was accompanied by her daughter. Dr. Ryan noted that plaintiff was "pleasant". She had no edema. Her gait, station and posture were normal; she had full painless range of motion and normal strength. Her psychiatric exam was normal with appropriate judgment and insight. He assessed insulin dependent diabetes mellitus which "remains satisfactory". He did not change her medication. He assessed hypertension "stable". No prescriptions were given. He recorded no complaints of or observations of any psychiatric symptoms.

On April 3, 2007, plaintiff was seen by James Pitt, D.O., of Columbia Surgical Associates for a condition unrelated to her disability application (Tr. at 230-231). Plaintiff reported "no increased nervousness, mood changes, or depression." She reported no changes in appetite or weight.

July 26, 2007, is plaintiff's alleged onset date.

_____

[4]Plaintiff's previous surname was Guevara (Tr. at 121).

On October 4, 2007, plaintiff, accompanied by her daughter, saw Dr. Ryan for medication refills (Tr. at 234-237, 263-266). She was observed to be pleasant with appropriate judgment and insight. No other psychiatric symptoms were complained of or observed. "Pt is doing fair, no swelling of her legs". Dr. Ryan observed no edema, according to the first page of the record. However, on the third page he wrote, "1+ edema below the knees." Her gait, station and posture were normal. Dr. Ryan assessed insulin-dependent diabetes mellitus which he noted "remains satisfactory." He did not change her medication. He assessed hyperlipidemia "stabilizing" and did not change her medications. He assessed hypertension "intermittent." No prescriptions were given for that. He assessed edema. "The patient's edema has not changed. Will not change medication, continue to monitor for complications." He told her to return in three months.

On October 31, 2007, Mac Maddox, Ph.D., completed a Psychiatric Review Technique (Tr. at 244-254). Dr. Maddox found that plaintiff's mental impairment is not severe. He found only mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. In support of his findings, Dr. Maddox wrote:

> The claimant is 48 years old with allegations of bipolar disorder She indicates that her ability to work is impacted by paranoia that she experiences when around people. The initial paperwork indicates she takes Depakote,[5] Seroquel,[6] and Effexor[7] to treat her symptoms. DO [disability officer] did not report the presence of any obvious psych-related difficulties at interview.
>
> Medical records from Missouri Valley Physicians is noted to prescribe those medications. The records received from this facility do not indicate any complaints or

---

[5]Treats seizure disorders.

[6]Treats major depressive disorder and bipolar disorder.

[7]Treats major depressive disorder.

concerns with the claimant's mental condition. She is primarily seen for diabetes follow up and hypertension. The most recent exam dated 10/4/07 indicates appropriate insight/judgement as do all the exams prior to that date. The claimant has no recent mental health hospitalizations, no complaints of mental health symptoms and no severe limitations in function report.

The function report was completed by the claimant's daughter who reportedly resides with her. It indicates she is capable of performing all household tasks, shopping, finances, drives, etc., without difficulty. The third party indicates she only has difficulty performing her activities of daily living if she is having an episode of bipolar disorder. The medical records do not indicate any recent "episodes" and certainly none of which have been reported to have caused recent hospitalization. And MDI [medically determinable impairment] is established with meds given to treat symptoms; however, there are no significant limitations noted.

On December 11, 2007, plaintiff, accompanied by her daughter, saw Dr. Ryan for blood work and complaining of a sore throat (Tr. at 258-262). Dr. Ryan noted that plaintiff was pleasant with appropriate judgment and insight. Plaintiff's exam was normal except her throat and it was noted that she was overweight. She had no edema, her gait, station and posture were normal. Dr. Ryan noted that plaintiff's diabetes remains satisfactory, her hypertension is "intermittent", her sore throat was "stable." He assessed bipolar affective disorder, mixed, but made no other comments about complaints, testing, or observations. He assessed "unspecified affective psychosis, stable," but again made no comments about complaints, testing, or observations. He assessed unspecified chest pain which he described as intermittent (Tr. at 261) despite having noted earlier during the exam that plaintiff had "no chest pain, pressure, discomfort, palpitations," etc. (Tr. at 258). He ordered a cardiac stress test. He assessed "other malaise and fatigue" which he noted had worsened; however, there were no complaints of malaise or fatigue in this or any other record. With this diagnosis, he indicated he would continue to monitor it for complications. He assessed hypersomnia[8] with sleep apnea "worsening." But again, there were no complaints of any symptoms in this or any

---

[8]Excessive daytime sleepiness.

other record. He told plaintiff to come back in three months.

On January 4, 2008, plaintiff was notified by Dr. Ryan that a cardiac stress test and myocardial perfusion examination performed on December 20, 2007, were normal (Tr. at 255-257).

On April 10, 2008, plaintiff saw Dr. Ryan for medication refills (Tr. at 358-362). She was described as pleasant, moderately overweight. Her exam was normal, including no edema. She had appropriate judgment and insight. She was assessed with satisfactory diabetes, stable hyperlipidemia, stable hypertension, stable reflux. She was told to return in four months.

On July 23, 2008, plaintiff saw Dr. Ryan complaining of stomach pains, blood in her stool, high blood sugar, and swollen legs (Tr. at 353-357). Plaintiff was "pleasant," overweight, she had no edema, normal gait, appropriate judgment and insight. The rest of her exam was normal. Dr. Ryan assessed satisfactory diabetes, stable hyperlipidemia, stable hypertension, stable reflux, and stable "blood in stool." He recommended a colonoscopy.

On August 4, 2008, plaintiff saw Dr. Ryan for a follow up (Tr. at 348-352). He described her as pleasant and wrote, "Patient is doing well." He noted trace pitting edema below the knees. Her judgment and insight were normal. The rest of his examination was normal. He assessed insulin-dependent diabetes, stable; hyperlipidemia, stable; hypertension, stable; and edema. "The patient's edema has not changed. Will not change medication, continue to monitor for complications." He told her to return in two months.

On August 20, 2008, plaintiff had a colonoscopy at Fitzgibbon Hospital (Tr. at 340-343, 346-347). No abnormal behavior was noted. Under review of symptoms, Marsha Moore, M.D., wrote, "Notable for being in general good health. . . . [P]sychiatric negative." Plaintiff was "well appearing, in no acute distress." In a report to Dr. Ryan, Dr. Moore wrote,

18

"Thank for allowing me to participate in the care of this very nice patient."

On August 26, 2008, plaintiff saw Dr. Newman at Missouri Valley Physicians for her annual gynecological exam (Tr. at 335-339). Plaintiff was in no acute distress. A full physical exam was performed. She had no edema. She had full painless range of motion of her neck, spine and all upper and lower extremities with normal strength and no tenderness anywhere. She was oriented to person, place, time and general circumstances. Her mood and affect were normal. "The patient has a normal examination with no abnormalities identified."

On October 7, 2008, plaintiff saw Dr. Ryan for a follow up (Tr. at 326-330). "Pt is doing well." She was reported to be moderately overweight. She had no edema. Her gait, station and posture were normal. Her judgment and insight were appropriate. Plaintiff's exam was normal. She was assessed with satisfactory diabetes, stable hyperlipidemia, stable hypertension. She was assessed with "bipolar affective disorder, manic, unspecified, recurrent" however no symptoms were complained of or observed. Plaintiff was told to return in three months.

On October 22, 2008, plaintiff saw Glenna Burton, M.D., at Burrell Behavioral Health for one hour (Tr. at 281). "Off from work - trying to get disability. 3 kids 23, 24 and 30. Lives in Marshall with husband. [illegible]. She has been off work 1 year. [illegible] Energy is low. Appetite is OK. Concentration is fair." Plaintiff reported feeling hopeless, but not suicidal. She reported having nightmares. She reported increased paranoia during the past couple of years. "She's been on leave from work when she started to have uncontrolled mood swings." Plaintiff reported hospitalization for depression 12 or 13 years ago. Dr. Burton did not perform any tests or record any observations. Her entire record is plaintiff's report. She assessed Bipolar Disorder - Type I - Depressed with Psychotic Features. She prescribed

Wellbutrin[9] and told plaintiff to return in two weeks.

On November 5, 2008, plaintiff saw Dr. Burton for 30 minutes (Tr. at 280). Her handwriting is difficult to read. Plaintiff reported that the Wellbutrin was causing headaches. Dr. Burton told her to take Motrin or Tylenol. "Mood is better. She still cries a lot [illegible] insomnia is gone. She takes the Seroquel and Lorazepam[10] at 8 pm and goes to bed at 9 pm. Energy is better but she tires easily. Appetite is less. She isn't waking up at night to eat. She is still isolating. She feels helpless less often. No suicidal thoughts. The voices are gone. She hasn't had nightmares for a couple of days. She is not as quiet. She is more relaxed. She is still improving. She denies any new stresses." Dr. Burton assessed "Bipolar Disorder - Type 1 - less depressed". She was told to continue taking Wellbutrin, Seroquel and Lorazepam and to return in a month.

On December 6, 2008, plaintiff saw Dr. Burton for 25 minutes (Tr. at 279). Dr. Burton's handwriting is difficult to read. She discussed plaintiff getting a headache a half an hour after taking medication, she noted that plaintiff is constipated. "She sleeps well. Energy is better. Appetite is less. She has lost some weight. Concentration is fair. She's reading some - the Bible. She still has nightmares sometimes and she still doesn't [want] to go anywhere." The remaining few lines of the record are illegible except the phrase "taking all these pills." Dr. Burton assessed Bipolar Disorder Type I. She continued plaintiff's Wellbutrin, Seroquel, and Lorazepam and told plaintiff to return in three months.

On January 9, 2009, plaintiff saw Dr. Ryan for a follow up (Tr. at 363-367). "Patient is doing well." She was pleasant. She had no edema, she had appropriate judgment and insight.

_____

[9]Treats major depressive disorder.

[10]Treats anxiety.

Her physical exam was entirely normal except she was described as being overweight. She was assessed with satisfactory diabetes, stable hyperlipidemia, stable bipolar affective disorder, and intermittent hypertension. He told her to return in six months.

On March 11, 2009, Dr. Burton completed a Psychiatric/Psychological Impairment Questionnaire (Tr. at 283-290). Dr. Burton indicated that she began treating plaintiff in 2007; however, her first medical record is dated October 22, 2008. She indicated that her most recent exam was March 11, 2009 -- the date this form was completed -- and that she saw plaintiff monthly. The records in the administrative transcript show that plaintiff saw Dr. Burton on three occasions -- October 22, 2008; November 5, 2008; and December 6, 2008 -- a 6 1/2 week period. She had diagnosed plaintiff with Bipolar Disorder Type 1 with a current GAF of 40 and the lowest GAF over the past year being 20. Her prognosis was "guarded. She speaks English poorly and has mood swings frequently which have been difficult to control with medication."

The form lists 32 clinical findings and asks Dr. Burton to mark each finding that supports her diagnosis. She checked the following:

        Poor memory
        Appetite disturbance with weight change
        Sleep disturbance
        Mood disturbance
        Emotional lability
        Delusions or hallucinations
        Anhedonia or pervasive loss of interests
        Psychomotor agitation or retardation
        Paranoia or inappropriate suspiciousness
        Feelings of guilt/worthlessness
        Difficulty thinking or concentrating
        Suicidal ideation or attempts
        Social withdrawal or isolation
        Blunt, flat or inappropriate affect
        Decreased energy
        Manic syndrome
        Hostility and irritability

When asked to identify the "laboratory and diagnostic test results which demonstrate and/or which support your diagnosis" she wrote "same for Bipolar Disorder." When asked to list plaintiff's primary symptoms, Dr. Burton wrote, "depressed mood, hypersomnia, malaise, anorexia, paranoid delusions, auditory hallucinations, isolation, anhedonia." The more frequent and severe of those symptoms were delusions, hallucinations, depression and isolation.

The form asks, "Has your patient required hospitalization or emergency room treatment for his/her symptoms" and Dr. Burton checked "yes" and indicated those hospitalizations were "yearly".

The form asks Dr. Burton to record her conclusions derived from her evaluation of the patient. "Each mental activity is to be assessed within the context of the individual's capacity to sustain that activity over a normal workday and workweek, on an ongoing basis in a competitive work environment." The rating scale is listed, and Dr. Burton circled "Markedly limited (effectively precludes the individual from performing the activity in a meaningful manner)." However, this is a confusing form, as it appears something is missing. Since the directions state that the doctor is to assess "each mental activity", one would expect to find a list of mental activities. However, there is none. I am unclear exactly what she found to be "markedly limited" on this page.

The next section of the form includes the 20 standard mental abilities, and Dr. Burton was to assess whether there was "no evidence of limitation," or whether plaintiff was "mildly limited," "moderately limited," or "markedly limited." She found that plaintiff was "markedly limited" in all 20 areas:

- The ability to remember locations and work-like procedures
- The ability to understand and remember very short and simple instructions

22

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

Dr. Burton was asked whether plaintiff experiences episodes of deterioration or

decompensation in work or work like setting which cause er to withdraw from that situation

23

and/or experience exacerbation of signs or symptoms.  She checked, "yes," but when asked to explain, she left that blank.  Again using check marks, Dr. Burton indicated that plaintiff's impairments were ongoing and were expected to last at least 12 months, she is not a malingerer, and her psychiatric condition exacerbates pain and other physical symptoms. When asked to explain, she wrote, "She doesn't follow the diabetic diet when she is not euthymic."  When asked whether plaintiff has a low IQ or reduced intellectual functioning, Dr. Burton checked, "no."  Using a check mark, Dr. Burton indicated that plaintiff is incapable of even "low stress" work.  When asked to explain the basis for her conclusions, she wrote, "Her mood becomes unstable with even mild stress."  With check marks, she indicated that plaintiff would have good days and bad days and that she would miss more than three days of work a month (the maximum number listed on the form) due to her impairments or treatment.

The form asks, "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?" and she wrote, "January 2008" which is almost 11 months before plaintiff's first visit with Dr. Burton and six months after her alleged onset date.

On May 20, 2009, plaintiff saw Dr. Ryan for a runny nose and bilateral leg pains (Tr. at 319-324).  He observed that she was pleasant, she had no edema or varicosities of the extremities, she had normal gait, station and posture, she showed appropriate judgment and insight.  He noted that her diabetes "remains satisfactory," her hyperlipidemia was stable, her hypertension was stable.  She had a cold.  He noted that her carpal tunnel syndrome was stable, although this was the first mention of carpal tunnel syndrome in the record.  He assessed worsening peripheral autonomic neuropathy (again, the first mention of this condition in the record) and prescribed Neurontin.  He told her to return in four weeks.

24

On May 27, 2009, plaintiff saw Dr. Ryan to "fill out disability paperwork" (Tr. at 316-318). She was noted to be pleasant. No other observations were noted, no examination was performed. Under "assessment/plan" Dr. Ryan wrote, "Paperwork filled out."

On May 27, 2009, Dr. Ryan completed a Multiple Impairment Questionnaire (Tr. at 292-299). He indicated he had been treating plaintiff for 5 years, with the most recent exam being the day before. He indicated that he treated plaintiff every three months. Dr. Ryan was asked for his diagnoses; he wrote:

> Diabetes mellitus type 1
> Hyperlipidemia
> Bipolar
> Peripheral neuropathy
> Hypertension
> GERD
> Fatigue
> Carpel tunnel right upper extremity

In addition, he included one additional diagnosis which was illegible. Her prognosis was "fair." He listed the following as her symptoms: depression, increased fatigue, poor memory, "patient doesn't want to be around others. Doesn't want to leave to [sic] house. No interest." He indicated that plaintiff's symptoms were "<u>not</u> from physical impairments." (emphasis in the original). He indicated that plaintiff experiences daily pain in her right hand from carpal tunnel syndrome and daily pain in her feet from prolonged standing due to peripheral neuropathy and history of diabetes. When asked to rate plaintiff's level of pain and fatigue, he circled 9 out of 10 on both and wrote, "as per patient".

Dr. Ryan found that in an eight-hour day, plaintiff can sit for one hour and can stand/walk for one hour. Additionally, she can not sit continuously but must move around every hour -- she would be able to sit again "immediately." She cannot stand or walk continuously.

When asked for additional limitations, he noted that plaintiff can occasionally lift up to 10 pounds "as per patient" and can occasionally carry ten pounds "as per patient." She has no significant limitations in repetitive reaching, handling, fingering or lifting.

The form asks, "Would your patient's symptoms likely increase if he/she were placed in a competitive work environment?" and Dr. Ryan checked "yes" and wrote in, "As per patient." He was asked, "does your patient's condition interfere with the ability to keep the neck in a constant position (e.g., looking at a computer screen, looking down at the desk)?" and he checked, "yes" and wrote in, "increased pain with movement." He indicated (with a check mark) that plaintiff cannot do a full time competitive job that requires keeping her neck in a constant position on a sustained basis. When asked how often plaintiff's pain, fatigue or other symptoms are severe enough to interfere with attention and concentration, he circled, "constantly." When asked if plaintiff is a malingerer, Dr. Ryan wrote, "Unknown."

The form asks to what degree plaintiff can tolerate work stress, and Dr. Ryan checked, "incapable of even low stress" -- the most restrictive choice. When asked to explain the basis for his conclusions, he wrote, "As per patient - can't to [sic] stress it bothers her". He indicated that plaintiff would need to take unscheduled breaks every hour and it is "unknown" how long it would take for her to be ready to return to work after a break. Using a check mark he indicated that plaintiff would be likely to miss more than three days of work per month (the largest number of days listed) due to her impairments or treatment. He indicated with a check mark that plaintiff needs a job that permits ready access to a restroom. He indicated that she has psychological limitations and that she needs to avoid heights. Finally, he was asked for the earliest date that the description of symptoms and limitations applies, and he wrote, "2007."

On August 26, 2009, plaintiff was examined by Robert Pulcher, Ph.D., at the request of the ALJ (Tr. at 300-305).

26

. . . She appeared terrified about the appointment, but did relax a little as the 4 hour appointment progressed and actually smiled a little at its conclusion. She was clean. . . No gait or posture problems were evident. . . . She appeared to give good effort when taking the tests but it was very difficult for the examiner. He was not able to complete the WMS-III because of lack of communication. . . .

Mental Status: Maria was oriented to time, person, place and situation. . . . Thoughts expressed, as translated by her daughter Erica, were limited but without delusional or hallucinatory thinking reported. . . . She did not have a sad, depressed affect and had no tears or sighing during the appointment, but appeared to be stoic and willing to comply with her daughter's instructions. She was nervous and agitated at the beginning of the testing but relaxed more as it progressed. She denied suicidal or homicidal ideation and no past suicide attempts were reported.

* * * * *

Brief Medical History: Maria reportedly has been hospitalized in Los Angeles and Marshall MO for Bipolar Affective Disorder. Documentation from Los Angeles reported Maria had quit taking her medications, and when they were restarted at the hospital she "brightened up right away". . . .

Summary of Test Results: On the WAIS-III Maria received the following I.Q. scores: Verbal Scale I.Q. 70; Performance Scale I.Q. 77; Full Scale I.Q. 71. All Maria's I.Q. scores place her within the Borderline Intellectual Functioning level of intelligence. . . . Maria's Index Scores . . . place her from the bottom of Borderline to the very top of that level. People with this level of intellectual functioning typically can hold jobs that are simple in nature and well supervised. Maria has at least a 12 year history of this type of work.

* * * * *

On the MMPI-2 Maria's score on the second scale is so high it makes the profile's validity very doubtful. On this particular test the first three scales are designed to indicate whether a person is attempting to make them self [sic] appear better or worse than is really the case. . . . Her T Score is above the 120 level. . . . Scores above 89T indicate a technically invalid protocol which should be interpreted seldom and only with the utmost caution. [The manual for the MMPI-2] further states the client may have misunderstood how to score the test but this examiner gave careful and detailed instructions to Maria's daughter who helped her complete the test by interpreting the items to be scored. He checked frequently to see that his instructions were understood and were being carried out.

Maria's score of 43 on the D (Depression) scale, if complete accurate, would indicate she is severely depressed, worrying, indecisive, and pessimistic. While she has some of these characteristics, the score of 19 on the Ma (Hypomania) scale indicates she has a "normal energy and activity level". This is not typical of a severely depressed person. . . . On the Sc (Schizophrenia) scale her score of 61, if completely true, would indicate

27

one needing hospitalization in order to function. She would have feelings of unreality, and bizarre or confused thinking. . . .

. . . This examiner does not believe Maria has a serious memory problem, and she is not malingering concerning memory. . . .

Conclusion: Results of the psychological interview and testing indicate Maria has Borderline Intellectual Functioning as found by the results of the WAIS-III. Her scores might have been much higher had the test been given entirely in her native language of Spanish. Documentation reported she was hospitalized in Los Angeles with the diagnosis of Schizo Affective Disorder and Bipolar. However, careful scrutiny of the documentation gives the indication she was not taking any medications for diabetes, other physical problems, or psychological conditions, and was agitated because of relationship problems, and angry about her life situation at that time. She responded quickly when back on her medications. . . . On the office Adult Intake Assessment Form Erica [plaintiff's daughter] wrote that Maria suffered "abuse and neglect when she was a child and by husband." The diagnosis of Bipolar I Disorder reported in documentation was not verified to this examiner by Maria or her daughter because of the lack of reported Manic behaviors. According to the DSM-IV manual this diagnosis must include 3 or more of the following:
>     Inflated self-esteem or grandiosity
>     Decreased need for sleep (e.g. feels rested after 3 hours of sleep)
>     More talkative than usual or pressure to keep talking
>     Flight of ideas or subjective experience that thoughts are racing
>     Distractibility
>     Increase in goal directed activity or psychomotor agitation
>     Excessive involvement in pleasurable activities

The diagnosis of Depressive Disorder NOS [not otherwise specified] better fits the evidence given by Maria for her psychological problems. . . . Maria's physical problems may cause disability, but it is this examiner's opinion her psychological status would not.

Dr. Pulcher assessed depressive disorder not otherwise specified (treated with medication) and a GAF of 58.[11]

Dr. Pulcher also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) (Tr. at 306-308). He found that plaintiff's ability to understand, remember and carry out even simple instructions is "extremely limited" because she "cannot speak

---

[11]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

English." He found that she is moderately limited in her ability to interact appropriately with the public, with supervisors, and with co-workers because she cannot speak or read English.

## V. FINDINGS OF THE ALJ

Administrative Law Judge Robert E. Ritter entered his opinion on November 20, 2009 (Tr. at 22-36). Plaintiff's last insured date is December 31, 2011 (Tr. at 22, 24). Therefore, plaintiff must establish disability on or before that date (Tr. at 22).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date of July 26, 2007 (Tr. at 24). Her 2008 earnings were below substantial gainful employment (Tr. at 24).

Step two. Plaintiff suffers from a depressive disorder, which is a severe impairment (Tr. at 24). Her obesity, insulin-dependent diabetes mellitus, hypertension, and hyperlipidemia are not severe impairments (Tr. at 24).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 29).

Step four. Plaintiff retains the residual functional capacity to perform the full range of medium work except she cannot perform more than simple, routine, repetitive tasks (Tr. at 30). With this residual functional capacity, plaintiff can return to her past relevant work as a meat processor (Tr. at 36).

## VI. OPINION EVIDENCE

Plaintiff argues that the ALJ erred in failing to give controlling weight to plaintiff's treating physicians, Dr. Ryan and Dr. Burton, and in failing to give weight to the opinion of the medical expert, Dr. Alex, and the consulting physician, Dr. Pulcher.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d

29

917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails

to give controlling weight to the opinion of the treating physician, then the ALJ must consider

several factors to determine how much weight to give the opinion: (1) the length of the

treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment

relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the

opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. §

404.1527(d)(2) - (5).

The ALJ had this to say about Drs. Ryan, Burton, Alex and Pulcher:

[T]he claimant's statements concerning the intensity, persistence and limiting effects of
these symptoms are not credible to the extent they are inconsistent with the above
residual functional capacity assessment. [Plaintiff does not challenge the ALJ's
credibility determination.]

. . . It is specifically noted that the medical source statement by Dr. Ryan prefaced many
of the limitations with the phrase "according to patient (i.e. the claimant)." It appears
that the restrictions were mentioned by the claimant, but not found by the doctor
during the course of treatment.

In terms of the claimant's alleged affective disorder, Dr. Burton indicated that she had
been under treatment since 2007. Yet, only treatment notes dating from October to
December 2008 were submitted into evidence. There was also reference to a session in
2009. Again, no treatment notes were submitted. Bipolar affective disorder was
included in assessment by Dr. Ryan in February 2007, October 2008, January 2009,
and characterized as stable in December 2007. It is further noted that the medical
source statement completed by Dr. Burton the earliest onset of the claimant's limitations
was January 2008. The few treatment notes of Dr. Burton were noted to be largely
illegible, making her remarks inadequate for evaluation purposes.[12] Dr. Burton further
indicated that the claimant's current GAF was 40; that is some impairment in reality
testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR
major impairment in several areas such as work or school, family relations, judgment,
thinking or mood (e.g., avoids friends, neglects family, and is unable to work). Her
lowest GAF in the past year was 20; that is some danger of hurting herself or others
(e.g., suicide attempts without clear expectation of death; frequently violent; manic
excitement); or occasionally fails to maintain minimal personal hygiene; or gross

---

[12] It appears I was able to decipher more of Dr. Burtons records than the ALJ. Although her
handwriting was difficult to read, I was able to read enough of them to determine what was in
and what was not in each record.

impairment in communication (e.g., largely incoherent or mute). Such a GAF would normally indicate the need for hospitalization. However, there was no evidence that the claimant had been admitted to a facility for psychiatric treatment since 2007. The basis for Dr. Burton's findings is not indicated in the record. It is further noted that the consulting psychologist's [Dr. Pulcher] findings of limitations were due to the fact that the claimant could not speak nor [sic] read English, not due to a medically determined mental impairment.

. . . As for the opinion evidence the undersigned accept[s] the findings of the state agency psychologist [Dr. Maddox].

At the hearing, medical expert Morris Alex, M.D., questioned the claimant's daughter regarding a statement by the attending psychiatrist stating the claimant had been hospitalized or an emergency room visits on a yearly basis, yet there was no evidence in the file. The claimant's daughter testified that, when she was younger, the family took her mother to the mental institutions. She did not remember the dates or times. She believed on occurred in 1993. Her mother had not been in the hospital for some time. She had not been in the ER in the past year or two. . . .

Dr. Alex testified that the claimant's affective disorder was primary. According to the 2008 notes from Burrell, her condition was occasionally better on medication, occasionally worse. However, the real support was based on the medical source statement from Dr. Burton. As Dr. Burton described the claimant, she met 12.04 A1 for depressive syndrome, B2 for manic syndrome, and B3 with marked difficulties in maintaining concentration, persistence, or pace. The psychiatrist did not indicate the severity of the claimant's manic syndrome or diminished concentration, persistence, and pace. Based upon the description by the claimant's daughter, [according to Dr. Alex] one would have to say it was moderately severe. Dr. Alex indicated that basically the claimant would meet Listing 12.04. In addition, the medical advisor testified that based upon the psychiatrist's statements, the claimant would have met Listing 12.04 as of her alleged onset date July 26, 2007. He believed there was [sic] enough objective medical status abnormalities demonstrated in the evidence to support the conclusions drawn by Dr. Burton. In addition, the psychiatrist marked all areas in the B criteria as markedly limited. Dr. Alex tended to agree with Dr. Burton's description. She would have marked limitations in the four categories of the B criteria. The medical advisor did not recommend any additional studies. With continued medication, the claimant may show some recovery. He suggested that consideration be given for review in a year or so.

In sum, the above residual functional capacity assessment . . . is supported by the rationale of state agency showing that the claimant's daughter indicated that her mother functions normally for the most part, except when she is in a deep depressive state. Again, there is no direct relationship between the symptom of depression, that is where one isolates and does not want to be in the company of others, and a finding that, when in the company of others in that same state, the claimant cannot control her actions, remain functioning with concentration and goal direction to perform work-related activities. Too much credit would need to be given to the claimant's subjective

31

symptoms which are in doubt by virtue of the inconsistencies and contradictions in this record and the invalid profile she developed in the MMPI study.

The undersigned does not give controlling weight to the opinion of Dr. Burton, the treating source. Her estimate of the claimant's mental status functioning finding, marked in all areas, is not supported by her own treatment notes or the other examinations in the record. The claimant has generally been found to be in no acute distress during many physical examinations. Her psychiatric status was within normal limits many times by her primary care physician. Her insight and judgement has been reported by Dr. Burton as fair or within normal limits. In addition, the undersigned does not accept Dr. Alex's opinion that the claimant would meet Listing 12.04 by virtue of Dr. Burton's mental capacity evaluation in the record. This is based on a finding that claimant's subjective complaints are exaggerated.

. . . [O]ne would have to accept claimant's subjective symptoms totally in order to find disability in this case. . . . It appears that there was marked exaggeration by the claimant in her subjective symptoms. Since the opinions expressed by Dr. Burton are based upon her total acceptance of claimant's subjective symptoms, which are questionable in regard to credibility by virtue of her performance on the MMPI, the marked limitations she found are not given controlling weight. The consulting psychologist found that, although the claimant did not have disability related to psychological functioning, he did feel she had a GAF rating of 58, which is at the high level of moderate limitation and only three points away from mild symptomatology. . . . With borderline intellect and language functioning deficit, the claimant would be limited to simple, routine repetitive tasks only. There is no real evidence that the claimant had difficulty interacting with coworkers, aside from the language barrier. There is no evidence offered from her prior place of employment where she had worked for many years to show that there were interpersonal relationship problems which caused her to have to leave that employment. The claimant is represented. It is presumed that, with representation, the most favorable case has been made for the claimant with the present record.

. . . Dr. Alex's testimony is accepted only as it goes to the claimant's lack of having a severe physical impairment. . . . From the mental status standpoint regarding her bipolar disorder, there is no evidence in this record of mania or manic episodes, as pointed out by Dr. Pulcher in his report.

(Tr. at 32-35).

Dr. Burton

In her March 11, 2009, Psychiatric/Psychological Impairment Questionnaire, Dr. Burton found that plaintiff is markedly limited in every single psychological function. In addition to those findings not being supported by the record, there are obvious falsehoods in

32

this report. Whether those came from plaintiff's allegations on that date or some other place, it is clear that they did not come from any medical records or any observations or findings made by Dr. Burton herself.

1. She stated that she had been treating plaintiff from 2007 through March 11, 2009. However, there are only three records in the file. The first visit was on October 22, 2008; the second on November 5, 2008; and the last on December 6, 2008. Therefore, instead of a more-than-two-year treatment relationship, the evidence establishes that there was a 6 1/2 week treatment relationship.

2. She found that plaintiff's current GAF was 40, lowest in the past year was 20. However, Dr. Burton never made any GAF assessments in her medical records and there is no evidence she examined plaintiff at the time she completed this form. A GAF of 20 means some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute). There is no evidence of any of this anywhere in the record much less in Dr. Burton's records. Not only are there no instances of suicide attempted, Dr. Burton's notes reflect just the opposite -- on October 22, 2008, she noted that plaintiff was not suicidal. On November 5, 2008, she noted that plaintiff was having no suicidal thoughts.

There is no evidence of any violent conduct on plaintiff's behalf. Although plaintiff, through her daughter, indicated that she cannot work because she gets angry with people, the record very consistently shows that plaintiff was a pleasant woman who had no difficulty getting along with anyone -- plaintiff and her daughter testified that she has no difficulty getting along with her family members. She saw Dr. Ryan regularly and he noted that she was "pleasant" on January 17, 2007; February 8, 2007; March 6, 2007; October 4, 2007;

December 11, 2007; April 10, 2008; July 23, 2008; August 4, 2008; January 9, 2009; May 20, 2009; and May 27, 2009. In fact, his records span 2 1/2 years and not once during that time did he ever observe plaintiff as having any trouble at all getting along with him, his staff, or anyone else, and plaintiff never complained during any of those visits about a problem getting along with anyone.

Dr. Newman saw plaintiff twice, those visits a year apart. Dr. Newman did not observe any difficulty on plaintiff's part with her ability to get along with anyone. Her mood and affect were noted to be normal on both visits.

Dr. Moore described plaintiff as a "very nice patient" and found her psychiatric exam to be negative.

Dr. Pitt indicated that plaintiff had reported no mood changes or depression. He did not observe any abnormalities in her behavior; he did not note any difficulty with her ability to get along with anyone.

Dr. Pulcher noted that plaintiff was very nervous about her psychological exam; however, he did not note any difficulty with plaintiff's ability to get along with him or anyone else.

The disability caseworker who met face to face with plaintiff observed no problems with her ability to get along with the caseworker or anyone else during the administrative interview.

There is simply no evidence at all in this record that plaintiff has difficulty getting along with people, except through her own subjective allegations which were found not credible -- findings which plaintiff does not challenge on this appeal.

Likewise, there is no evidence in any medical record from any doctor indicating that plaintiff ever complained of any behavior that could be interpreted as manic. Dr. Pulcher even

34

noted the lack of any manic symptoms anywhere in the medical record.

There is no evidence plaintiff ever had any problems with personal hygiene, with being incoherent or mute.

As a result of all of this, the record is completely devoid of any evidence to support Dr. Burton's finding in this Psychiatric/Psychological Impairment Questionnaire that plaintiff suffered from a Global Assessment of Functioning of 20 during the preceding year.

3.    Dr. Burton indicated that plaintiff's prognosis is guarded because of her problems with English and because she suffers from frequent mood swings which "have been difficult to control with medication."  Dr. Burton prescribed medication on October 22, 2008. Three and a half weeks later at plaintiff's next appointment, Dr. Burton noted that plaintiff's mood was better.  She "continued" plaintiff's medications -- she did not change the dose, she did not change or add any prescriptions.  A month later at plaintiff's last appointment with Dr. Burton, she noted that plaintiff was sleeping well, her energy was better, her concentration was fair.  Again she merely continued plaintiff on her same medications and told her to return in three months.  This clearly establishes that Dr. Burton believed that plaintiff's medication was adequately controlling her symptoms.  A finding that symptoms are "difficult to control with medication" should be supported by records indicating that the doctor tried different medicines, different doses, etc.  In this case, Dr. Burton prescribed medication and kept plaintiff on that medication while noting great improvement in her symptoms and recommending that she no longer needed to be seen very often.  Her records completely contradict this part of the Impairment Questionnaire.

4.    Dr. Burton, using check marks, indicated in the Impairment Questionnaire that plaintiff suffers from sleep disturbance.  Yet in the second and third of three records, she noted that plaintiff's "insomnia is gone" and that plaintiff "sleeps well."  In the Impairment

35

Questionnaire Dr. Burton checked "delusions or hallucinations;" however, in her medical records she noted on the second visit that plaintiff said, "the voices are gone." There is no other mention of delusions or hallucinations in Dr. Burton's records or in any other medical record. She checked "difficulty thinking or concentrating." However, in the first medical record, she noted that plaintiff's concentration was fair. In the second one she noted no difficulty with concentration. In the last record she noted that plaintiff's concentration is fair. She checked "suicidal ideation." However, during plaintiff's first visit she said she was not suicidal. In her second visit she said she was having no suicidal thoughts. There is no mention of suicidal thoughts in the third visit. When plaintiff saw Dr. Pulcher, she denied suicidal thoughts. There is no mention of suicidal thoughts in any other medical record. Clearly this entire page (Tr. at 284) of the Impairment Questionnaire is unsupported by either Dr. Burton's records or the other medical records in this file.

5.      Dr. Burton noted that plaintiff's "more frequent and/or severe" symptoms are delusions, hallucinations, depression and isolation. As noted above, there is no evidence of delusions or hallucinations. There is little evidence of complaints of or findings of depression in the record. Plaintiff told Dr. Pitt she was not suffering from depression. Dr. Pulcher observed that plaintiff did not have a sad, depressed affect. Dr. Ryan consistently noted that plaintiff's mood and affect were appropriate. Even Dr. Burton, in her second medical record less than a month after putting plaintiff on medication, noted that plaintiff was less depressed, her mood was better, her insomnia was gone, her energy was better, she was not waking up at night to eat, she felt hopeless less often, she had no suicidal thoughts, voices were gone, she had not had nightmares for a while, she was not as quiet, and she was more relaxed. All of these observations were made by Dr. Burton, the doctor who then found in disability paperwork that plaintiff was markedly limited in every single psychological function.

36

6. Dr. Burton indicated that plaintiff's symptoms had required hospitalizations yearly. This is directly contradicted by her own medical records. During plaintiff's first visit, she indicated that she had been hospitalized for depression 12 or 13 years ago. Therefore, this notation on the Impairment Questionnaire clearly came either from plaintiff's exaggeration or Dr. Burton's attempt to exaggerate the record in order to secure benefits for her patient, for if she had reviewed her own records she would have known this statement was false.

7. As mentioned above, Dr. Burton found that plaintiff is markedly limited in all 20 psychological functions. There simply is no support for these findings, not even in plaintiff's own allegations. One of the factors is the ability to travel to unfamiliar places or use public transportation. Plaintiff and her daughter indicated that plaintiff is able to drive and goes out alone. One of the factors is the ability to adhere to basic standards of neatness and cleanliness. There is no recorded observation of a difficulty in this area, and plaintiff and her daughter indicated that plaintiff generally has no difficulty with personal care. Because of the complete lack of support for these findings (and in many instances these findings are more severe than plaintiff's exaggerated allegations), it appears that Dr. Burton simply made the worse possible finding on every factor on this form in order to assist her patient in securing benefits.

8. Dr. Burton found (again with a checkmark) that plaintiff could not perform even a low stress job. There is no complaint in any medical record of any doctor of a problem handing stress.

9. Finally, Dr. Burton indicated (again with a checkmark) that plaintiff's symptoms or treatment would cause her to miss more than three days of work per month. Because plaintiff only saw Dr. Burton three times and on the final visit she indicated that plaintiff did not need to return for three more months, it is unclear exactly what would cause plaintiff to miss this much work, and indeed Dr. Burton did not shed any light on this finding.

37

In the three medical records completed by Dr. Burton, there are more positive notations than negative. During the first appointment, Dr. Burton recorded only that plaintiff is trying to get disability and the rest of the record was her repeating what plaintiff had said. On the second appointment, plaintiff's mood was better, her insomnia was gone, energy was better, she was not waking up at night to eat, her feelings of hopelessness had improved, she had no suicidal thoughts, was hearing no voices, her nightmares had stopped, she was more relaxed and not as quiet. All of these improvements took place less than a month after Dr. Burton prescribed psychiatric medicine. By the following month, plaintiff had continued to improve, her medication was not adjusted, and she was told she did not need to return for another three months. The substantial evidence in the record supports the ALJ's finding that Dr. Burton's Impairment Questionnaire deserves no weight.

Dr. Alex

Dr. Alex testified as a medical expert at the administrative hearing. Dr. Alex relied on the Impairment Questionnaire completed by Dr. Burton ("but the real document is based on the -- on Dr. [Burton] -- 5F-1 completed on 3/11/09. . . . [W]hat she describes, she meets A-1 and meets B-2 and 3, but under B-2 and 3 she does not indicate the severity; but from what the daughter describes one would have to say it is moderately severe." Tr. at 67-68). Although Dr. Alex was asked whether there was "enough actual objective mental status abnormality demonstrated in the psychiatric evidence in the record to support the conclusions drawn by Dr. Burton" and he said, "yes," clearly that is not the case, as is described at length above. Indeed, Dr. Alex did not identify any objective evidence much less sufficient objective evidence to support Dr. Burton's findings that plaintiff is markedly limited in every psychological function. Because Dr. Alex relied solely on Dr. Burton's unsupported findings and plaintiff's

38

exaggerated testimony (again, a finding which was not challenged in this appeal), the ALJ properly gave no weight to Dr. Alex's testimony regarding plaintiff's mental impairment.

Dr. Pulcher

Dr. Pulcher examined plaintiff after the administrative hearing. He found that plaintiff exaggerated her responses during testing in order to make herself appear more limited than she really was. He found that her psychological condition is not disabling. The ALJ gave weight to all of Dr. Pulcher's findings except his final conclusion that plaintiff's ability to understand, remember and carry out even simple instructions is "extremely limited" because she "cannot speak English." This is not an opinion based on plaintiff's medically determined impairment; therefore, the ALJ was justified in giving no weight to this statement.

Dr. Ryan

Finally, plaintiff challenges the ALJ's failure to give weight to the opinion of Dr. Ryan as reflected in the Impairment Questionnaire he completed on May 27, 2009. Dr. Ryan noted that plaintiff was "not" disabled from physical impairments. The limitations he marked on this form were qualified with "as per patient" which he wrote next to almost all of his responses. Plaintiff's pain being a 9 out of 10 was "as per patient." Her fatigue being a 9 out of 10 was "as per patient." Her lifting limitations were "as per patient." The affect on her symptoms of being placed in a competitive work environment was "as per patient." When asked whether plaintiff is a malingerer, Dr. Ryan wrote, "unknown." Plaintiff's inability to perform even a low-stress job was "as per patient." It is clear that Dr. Ryan merely checked the information plaintiff asked him to check, and he obviously wanted that known to the reader. The ALJ did not err in giving no weight to this form -- it was based entirely on plaintiff's non-credible allegations and it is unsupported by the 2 1/2 years of Dr. Ryan's medical records which

Case 4:11-cv-04297-REL   Document 27   Filed 03/11/13   Page 39 of 43

include thorough physical exams and normal physical and psychological findings on a consistent basis.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's findings with regard to which opinions deserve weight. Plaintiff's motion for judgment on this basis will be denied.

## VII. MENTAL RETARDATION LISTING

Plaintiff argues that the ALJ erred in finding that plaintiff's mild mental retardation does not meet listing 12.05C which requires a valid verbal, performance, or full scale I.Q. score of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, Listing § 12.05C.

The Eighth Circuit has interpreted Listing 12.05C -- mental retardation -- to require a claimant to show each of the following three elements: "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." McNamara v. Astrue, 590 F.3d 607, 610-611 (8th Cir. 2010), quoting Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

Dr. Pulcher tested plaintiff and determined that she had a verbal I.Q. of 70, a performance I.Q. of 77, and a full scale I.Q. of 71. However, he also indicated that plaintiff's scores likely would have been higher had she been given the test in Spanish, her native language. Therefore, the validity of the I.Q. scores is in question. The fact that plaintiff was found to have exaggerated her symptoms on another test that same day lends additional support to a finding that these I.Q. scores are not valid.

Plaintiff fails to address the second requirement, i.e., an onset of the impairment before age 22. The ability to hold a job is "particularly useful in determining the individual's ability

40

or inability to function in a work setting." <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1184-1186 (3rd Cir. 1992) (quoting 20 C.F.R. pt. 404, subpt. P, app 1, § 12.00D). Plaintiff clearly worked at the substantial gainful activity level for many years, which strongly supports a finding that plaintiff does not meet this requirement of the listing.

The substantial evidence in the record establishes that plaintiff does not meet the requirements for Listing 12.05C.

## VIII. PLAINTIFF'S ILLITERACY

Plaintiff argues that the ALJ erred in failing to find that plaintiff is illiterate (because she cannot communicate in English) leading to a finding of disability under Grid Rule 201.17 and/or Rule 202.09 of the Medical-vocational Guidelines.

20 C.F.R. Pt. 404, Subpt. P, Appendix 2 to Subpart P of the Medical Vocational Guidelines, § 201.00(h)(1) provides:

> The term younger individual is used to denote an individual age 18 through 49. For individuals who are age 45-49, age is a less advantageous factor for making an adjustment to other work than for those who are age 18-44. Accordingly, a finding of "disabled" is warranted for individuals age 45-49 who: . . .
>
> (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English.

Section 201.00(i) provides:

> While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance. Similarly the lack of relevant work experience would have little significance since the bulk of unskilled jobs require no qualifying work experience. Thus, the functional capability for a full range of sedentary work represents sufficient numbers of jobs to indicate substantial vocational scope for those individuals age 18-44 even if they are illiterate or unable to communicate in English.

Although Rule 201.17 applies to younger, unskilled individuals, who are unable to communicate in English, the Rule applies to individuals who are limited to sedentary work,

Case 4:11-cv-04297-REL   Document 27   Filed 03/11/13   Page 41 of 43

factors that are not applicable to plaintiff. Plaintiff states that she has difficulty standing for long periods of time, can only sit, stand and walk for a total of two hours per day, and cannot lift more than ten pounds and therefore should have been limited to sedentary work rather than medium, as found by the ALJ. However, these physical limitations were contained in Dr. Ryan's report which was properly given no weight, as discussed above. Therefore, this argument is without merit.

## IX.  VOCATIONAL EXPERT

Finally, plaintiff argues that the ALJ erred in failing to take testimony from a vocational expert and instead finding (by utilizing the Medical-Vocational Rules) that plaintiff can return to her past relevant work as a meat processor.

Because the ALJ properly decided that plaintiff could return to her past relevant work, the testimony of a vocational expert was not required to prove that plaintiff could perform other work. Lewis v. Barnhart, 353 F.3d 602, 648 (8th Cir. 2003); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Grace v. Sullivan, 901 F.2d 660, 662 (8th Cir. 1990). Plaintiff further alleges that the ALJ erred in relying on the Medical-Vocational Guidelines and by not considering all of her non-exertional limitations, specifically, her need for unscheduled breaks, excessive absences, impaired concentration, difficulty making judgments, and inability to deal with stress, among other limitations. However, as discussed above, those findings were made in Impairment Questionnaires which were properly given no weight. Because the ALJ found that with her residual functional capacity, as properly assessed by the ALJ, plaintiff could return to her past relevant work as a meat processor, he was not required to take testimony from a vocational expert prior to finding plaintiff not disabled. Jones v. Chater, 86 F.3d 823, 825 (8th Cir. 1996); Gaddis v. Chater, 76 F. 3d 893, 896 (8th Cir. 1996); Jackson v. Sullivan, 984 F.2d 967 (8th Cir. 1993); Brunston v. Shalala, 945 F. Supp. 198, 202 (W.D. Mo. 1996).

## X.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 11, 2013

Case 4:11-cv-04297-REL   Document 27   Filed 03/11/13   Page 43 of 43